1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7   JAMIE BADDOUR,

8               Plaintiff,

9        v.

10  SEAN HART, et al.,

11              Defendants.

12
13

Case No.  14-cv-1355-PJH

**ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY
JUDGMENT; ORDER DENYING
PLAINTIFF'S MOTION FOR
SANCTIONS AND TO STRIKE**

14        Defendants' motions for summary judgment came on for hearing before this court

15  on December 16, 2015.  Plaintiff appeared by her counsel Patricia Barry; defendant

16  Mazen Salfiti appeared by his counsel Glen Belovsky; and defendants City of Daly City

17  and Officer Shane Hart (sued as "Sean Hart") appeared by their counsel Rodrigo Salas.

18  Plaintiff also filed a motion to strike and for sanctions, which the court indicated it would

19  decide on the papers.  Having read the parties' papers and carefully considered their

20  arguments and the relevant legal authority, the court hereby GRANTS defendants'

21  motions, and DENIES plaintiff's motion to strike and for sanctions.

22                                    **BACKGROUND**

23        This is a case alleging various civil rights claims, brought by plaintiff Jamie

24  Baddour ("Baddour") in connection with an incident that occurred on January 25, 2012.

25  Defendants are the City of Daly City, California; Daly City Police Officer Shane Hart

26  ("Officer Hart"); a Daly City Police Officer "Doe;" and plaintiff's estranged husband Mazen

27  G. Salfiti ("Salfiti"),

28        At the time of the incident, Baddour and Salfiti were in the process of getting a

*United States District Court
Northern District of California*

divorce, and their relationship was acrimonious.  They had a custodial arrangement whereby they alternated staying at the parental home ("the residence"), so that their four children could remain in one location.  Baddour alleges that she had contacted the Daly City Police Department ("DCPD") on at least three occasions prior to the incidents that form the basis of the complaint in this case, and that because of alleged "attacks" by Salfiti, she had applied for a domestic violence restraining order on January 24, 2012.

At 7:00 a.m. on the morning of January 25, 2012, as Salfiti was preparing the children for school, Baddour entered the residence.  Salfiti asserts that she was in an agitated state, and that she began cussing and yelling at him in front of the children.  He then gathered the two oldest girls and went downstairs to the garage, in preparation for taking them to school.  He claims that Baddour followed him, continuing to yell and call him names.  Salfiti asserts that because of Baddour's past aggressive behavior towards him, he decided to record the incident on his cellphone.

After Salfiti left the residence with the two older girls, Baddour telephoned the DCPD to request assistance in connection with alleged verbal and physical abuse directed towards her by Salfiti.  She stated that Salfiti "split my hand open" and that she wanted to make a report, but she also stated she did not want an ambulance.

Officer Hart responded to the call, arriving at the residence at approximately 7:43 a.m.  He states in his declaration that when he arrived, Baddour was in an "emotional state."  He noticed a small laceration on the underside of her left thumb.  He called fire/medical personnel, who responded.  However, Baddour declined treatment.

Officer Hart interviewed Baddour, who reported that she and Salfiti had gotten into a verbal altercation in front of two of their children, and that she became angry when Salfiti began recording her with his phone.  According to Officer Hart, Baddour told him that she tried to grab the phone away from Salfiti.  Baddour denied hitting Salfiti or attempting to hit him, but admitted that she took his Rolex watch, which was lying on the washing machine, and threw it on the ground.  Baddour also admitted that two of the children saw her attempt to grab the phone and also saw her throw the watch.

2

1    Officer Hart states in the police report that Baddour told him that after Salfiti left,

2  she noticed her thumb was bleeding.  She believed, but was not certain, that she

3  sustained the injury when she tried to grab the phone away from Salfiti.  She testified that

4  both their hands connected and they both squeezed each other's hands, and she may

5  have sustained the laceration by one of his fingernails during the process, but she could

6  not be sure.[1]  Officer Hart states that Baddour denied that any physical violence had

7  occurred that day, but claimed that in the past, Salfiti had pushed her, slammed doors in

8  her face, and used profanity towards her, although he had never hit or slapped her.

9    Salfiti has submitted a declaration from his mother, Joy Salfiti, stating that at about

10  8:00 a.m. on January 25, 2012, Baddour called her to complain about Salfiti, and when

11  she asked Baddour if Salfiti had hit her, she replied "no."  He has submitted a similar

12  declaration from his sister-in-law, Maritsa Salfiti, stating that at about 8:15 a.m., Baddour

13  called her, and she asked Baddour if Salfiti had hit her, and she replied "no."  (In her

14  October 8, 2015, deposition, Baddour denied having told Joy or Maritsa Salfiti that Salfiti

15  did not hit her.)

16    After Salfiti dropped the children off at school, he drove to the DCPD to report the

17  incident.  When he arrived, he was advised that Baddour had already called the police,

18  and that an officer had been dispatched to the residence.  While Officer Hart was at the

19  residence, he received a call advising that Salfiti was at the DCPD.  He left the residence

20  and went to the DCPD to interview Salfiti.

21    Prior to the interview, Officer Hart asked permission to view the video on Salfiti's

22  phone.  He states that when watching the video, he observed Baddour in an angry and

23  emotional state, and also saw two children "with frightened looks on their faces."  He

24  states that the video shows Baddour suddenly charging towards Salfiti, raising her arms

25  up and swinging her arms down in a downward motion, and that although the video does

---

[1]  In her October 8, 2015, deposition, Baddour testified that she had told Officer Hart
during the interview that when she attempted to grab Salfiti's phone, he used his nails to
cut her hand, although she also testified that she didn't know when it happened.

United States District Court
Northern District of California

not show Baddour hitting Salfiti, he could hear the sounds of impacts.

Officer Hart states that Salfiti reported that during the altercation, he took out his cellphone and began recording the incident, and that while he was recording, Baddour suddenly ran towards him, yelling and screaming, and began hitting him on top of the head.  He stated that she also tried to grab the cell phone out of his hand.  Salfiti denied placing his hands on Baddour during the incident.  Officer Hart also states that Salfiti told him that Baddour had grabbed his Rolex watch and thrown it, causing it to break into pieces.  Officer Hart also testified that while he was interviewing Salfiti, he noticed a slight redness on the side of Salfiti's head.

Prior to the interview with Salfiti, Officer Hart briefly exited the interview room, leaving his notebook in the room.  The notebook contained notes of his investigation into the incident, and also unrelated matters, and Officer Hart states that he did not intend to leave his notes in the room, and did not intend for Salfiti to read the notes.

The video of the interview room shows Salfiti looking through Officer Hart's notebook.  Salfiti testified in his deposition that he read the notes for "a couple of minutes," but that he did not recall what they said.  He makes the same assertion in his declaration.  Officer Hart testified in his deposition that he was unaware that Salfiti had looked at the notes until some time later, when he viewed the videotape of the surveillance camera in the interview room.  However, at the time he prepared his report of the incident, he was unaware that Salfiti had looked at the notes.

Officer Hart also testified that he had not ever previously spoken with Salfiti and that he had no prior relationship with him.  For his part, Salfiti asserts that he had no prior interaction with Officer Hart until the police interview, that neither he nor any members of his family have any relatives that work for the DCPD, that he did not ask Officer Hart to arrest Baddour, and that he never sought or made any agreement with any Daly City Police Officer to arrest, prosecute, defame, or imprison Baddour.

Baddour testified in her deposition that she was not aware of any relationship between Salfiti and Officer Hart prior to the incident.  However, she claimed that a "family

4

United States District Court
Northern District of California

1    friend" (she could not recall who) had told her mother that Salfiti's mother had some

2    family member in the DCPD (although she could not recall who the family member was).

3    She also stated that Salfiti "may know people" in the DCPD.  She added that Salfiti was

4    an attorney, and "most of the time attorneys know cops, and the cops know attorneys,

5    and the City Councils, who's where and what's going on, from my knowledge" (obtained

6    through "four years in divorce court").  Because "[e]veryone all kind of works together, . . .

7    it wouldn't be farfetched that he knew people in the Daly City city itself as well."

8        Officer Hart states in his declaration that based on his interviews with Baddour and

9    Salfiti, his review of the video from Salfiti's phone, and the facts known to him at the time,

10   he concluded that Baddour was the dominant aggressor.  Accordingly, he made the

11   decision to arrest Baddour for violating California Penal Code § 273.5 (spousal abuse)

12   and § 273A (child endangerment).  Baddour was arrested at approximately 11:00 a.m.

13       Plaintiff was taken to the DCPD, where she was read her rights.  She was then

14   transferred to the San Mateo County Jail in Redwood City.  She asserts that during the

15   ride, Hart telephoned Salfiti and asked if he still wanted to "go through with this."  Once at

16   the jail, plaintiff was booked and processed.  She was held until she was released on bail

17   between 8:00-10:00 p.m.

18       Approximately two months later, on March 23, 2012, the San Mateo County

19   District Attorney's office moved to dismiss the criminal charges after having reviewed the

20   video of Salfiti's interview at the DCPD on the day of the incident, which showed him

21   looking through Officer Hart's notebook while Hart was out of the room.

22       Plaintiff filed the original complaint on March 24, 2014, and filed a first amended

23   complaint ("FAC") on April 28, 2014.  The Daly City defendants filed an answer to the

24   FAC on August 13, 2014, and Salfiti filed an answer on August 14, 2014.

25       In the FAC, plaintiff asserts (1) a claim under 42 U.S.C. § 1983 alleging conspiracy

26   to initiate malicious prosecution against plaintiff in violation of the Fourth Amendment

27   (against Hart and Salfiti); (2) a claim under § 1983 alleging conspiracy to falsely arrest

28   and imprison plaintiff in violation of the Fourth Amendment (against Hart, Salfiti, and

"Doe" Officer 1); (3) a claim under § 1983 alleging conspiracy to defame plaintiff (by false arrest, false imprisonment, malicious prosecution) in violation of the Due Process Clause of the Fourteenth Amendment (a "stigma-plus" claim) (against Hart, Salfiti, and "Doe" Officer 1); (4) a claim under the Bane Act, Cal. Civ. Code §§ 52, 52.1, alleging conspiracy to commit false arrest, false imprisonment, malicious prosecution, and "stigma-plus" (against Hart, Salfiti, and "Doe" Officer 1); (5) a claim of municipal liability under § 1983 alleging improper training of police officers (against the City of Daly City); (6) a claim of spousal abuse under Cal. Civ. Code § 1708.5 (which plaintiff now claims should have been brought under § 1708.6) (against Salfiti); and (7) a claim of intentional infliction of emotional distress (against Salfiti).

The Daly City defendants (the City of Daly City and Officer Hart) filed a motion for summary judgment on November 9, 2015, and Salfiti filed a motion for summary judgment on November 10, 2015.  They seek summary judgment as to all claims asserted against them.

The cut-off date for non-expert discovery was originally set for October 2, 2015. Defendants propounded interrogatories and requests for production of documents to Baddour on September 1, 2015.  Plaintiff filed no responses on October 1, 2015 (the due date).  On October 16, 2015, defendants filed a motion to compel discovery.  While that motion was pending, the parties reached an agreement pursuant to which Baddour would be allowed until October 29, 2015 to respond to the discovery requests.  When Baddour was unable to make that deadline, defendants agreed to extend the deadline to October 30, 2015.  Plaintiff did not submit any discovery responses by that final deadline.

The Daly City defendants filed their summary judgment motion on November 9, 2015, and a few hours later, Baddour served her responses to discovery.  Thus, none of the information (if any) produced by Baddour in discovery could be incorporated into the Daly City defendants' motion.  Salfiti filed his summary judgment motion on November 10, 2015, but he also was effectively precluded from incorporating any of the information in Baddour's responses into his motion.

United States District Court
Northern District of California

1    Under the Civil Local Rules, Baddour's opposition to the two motions was due on

2  November 23 and 24, 2015, respectively.  She did not file a timely opposition.  Instead,

3  on November 23, 2015, she filed a motion to "strike" the summary judgment motions and

4  to "strike" the video of the incident taken by Salfiti on his cellphone ("the Salfiti video").

5  She claims that the video, which defendants have attached as an exhibit to their motions,

6  has been tampered with or was forged or fraudulent, because Salfiti stated during the

7  interview at the DCPD that he told Baddour he was recording the incident, but the video

8  does not include such a statement.  In any event, Baddour argues that the video is not

9  admissible evidence.

10    Also on November 23, 2015,  Baddour filed a motion to stay or continue the

11  hearing on the summary judgment motions pending resolution of her motion to "strike."

12  On November 24, 2015, the court denied that motion, as well as the motion to "strike" the

13  summary judgment motions.

14    A week later, on November 30, 2015, plaintiff filed a "supplemental" memorandum

15  of points and authorities in opposition to the summary judgment motions.  On December

16  1, 2015, plaintiff filed an "ex parte" request that the court consider the "supplemental"

17  memorandum as "part of" her opposition to the summary judgment motions.  On

18  December 3, 2015, the court issued an order denying that request, on the basis that it

19  was filed a week late, on the date the defendants' reply briefs were due, and that there is

20  no provision in the Local Rules for filing a "supplemental" opposition.

21                                    **DISCUSSION**

22  A.    Legal Standards

23         1.    Motions for Summary Judgment

24    A party may move for summary judgment on a "claim or defense" or "part of . . . a

25  claim or defense."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when there

26  is no genuine dispute as to any material fact and the moving party is entitled to judgment

27  as a matter of law.  Id.

28    A party seeking summary judgment bears the initial burden of informing the court

1   of the basis for its motion, and of identifying those portions of the pleadings and discovery

2   responses that demonstrate the absence of a genuine issue of material fact.  Celotex

3   Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Material facts are those that might affect the

4   outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A

5   dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable

6   jury to return a verdict for the nonmoving party.  Id.

7       Where the moving party will have the burden of proof at trial, it must affirmatively

8   demonstrate that no reasonable trier of fact could find other than for the moving party.

9   Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  Where the

10  nonmoving party will bear the burden of proof at trial, the moving party can prevail merely

11  by pointing out to the district court that there is an absence of evidence to support the

12  nonmoving party's case.  Celotex, 477 U.S. at 324-25.  If the moving party meets its initial

13  burden, the opposing party must then set out specific facts showing a genuine issue for

14  trial in order to defeat the motion.  Anderson, 477 U.S. at 250; see also Fed. R. Civ. P.

15  56(c), (e).  When deciding a summary judgment motion, a court must view the evidence

16  in the light most favorable to the nonmoving party and draw all justifiable inferences in its

17  favor.  Anderson, 477 U.S. at 255; Hunt v. City of L.A., 638 F.3d 703, 709 (9th Cir. 2011).

18      2.    Motions to Strike

19      Under Federal Rule of Civil Procedure 12(b)(f), the court "may order stricken from

20  any pleading any insufficient defense or any redundant, immaterial, impertinent, or

21  scandalous matter."  Fed. R. Civ. P. 12(f).  The function of a 12(f) motion to strike is to

22  avoid the expenditure of time and money that must arise from litigating spurious issues

23  by dispensing with those issues prior to trial . . . ."  Whittlestone, Inc. v. Handi-Craft Co.,

24  618 F.3d 970, 973 (9th Cir. 2010) (quotation and citation omitted).  In order to determine

25  whether to grant a motion to strike under Rule 12(f), the court must determine whether

26  the matter the moving party seeks to have stricken is (1) an insufficient defense; (2)

27  redundant; (3) immaterial; (4) impertinent; or (5) scandalous.  Id. at 973-74.

28      There is no provision in the Federal Rules or the Civil Local Rules for a "motion to

United States District Court
Northern District of California

strike" evidence submitted in support of an opposing party's motion.  By this motion, plaintiff appears to be attempting to object to evidence submitted by defendants in support of their summary judgment motions.  Such objections to evidence are properly presented as part of the opposition to a motion.  See Civ. L.R. 7-3(a).

B.     The Parties' Motions

Defendants argue that summary judgment should be granted in their favor because Baddour has no evidence to support any of her claims.  The Daly City defendants assert further that all Baddour's claims are time-barred; that Baddour has no admissible evidence of any conspiracy to violate her civil rights; that Officer Hart had probable cause to arrest Baddour; that Officer Hart is entitled to qualified immunity; and that Baddour has not stated a Monell claim against the City.

In addition, Salfiti argues that the sixth and seventh causes of action must be dismissed for lack of evidence; that the sixth cause of action is improperly pled; that the seventh cause of action is barred by issue preclusion; and that both the sixth and seventh causes of action should be dismissed pursuant to 28 U.S.C. § 1367(c) in the absence of any viable federal claim.

Baddour seeks an order striking the cell phone video taken on January 25, 2012 by  Salfiti, attached as an exhibit to the Salfiti Declaration in support of defendants' motions.  Baddour claims that the video is not properly authenticated and that it was tampered with and thus is "fraudulent."  She also seeks monetary sanctions against defendants and their counsel, in the form of attorney's fees and costs for the litigation of this case.

1.     Defendants' motions

a.     Whether plaintiff's claims are time-barred

Defendants assert that all Baddour's claims are time-barred, because the complaint was filed more than two years after the January 25, 2012 incident.  At the hearing, plaintiff's counsel conceded that the second and fourth causes of action are time-barred.

United States District Court
Northern District of California

1    In California, the limitation period for personal injury actions is two years.  Cal. Civ.

2  P. Code § 335.1.  For claims under 42 U.S.C. § 1983, courts apply the most analogous

3  limitation period from the forum state – here, that is California's personal injury limitation

4  period.  Wilson v. Garcia, 471 U.S. 261, 268 (1985).

5    In federal court, federal law determines when a claim accrues.  Lukovsky v. City &

6  Cnty. of S.F., 535 F.3d 1044, 1048 (9th Cir. 2008).  Accrual is the date on which the

7  statute of limitations begins to run; under federal law a claim accrues when "the plaintiff

8  knows of has reason to know of the injury which is the basis of the action."  Id. (citations

9  and quotations omitted).  For example, under federal law, a claim for false arrest and

10  imprisonment accrues when an individual's imprisonment ends or when he becomes

11  detained pursuant to legal process, such as when he is arraigned on charges.  See

12  Wallace v. Kato, 549 U.S. 384, 388-90 (2007).

13    Here, all Baddour's § 1983 claims – with the exception of the first cause of action

14  for malicious prosecution and the third ("stigma plus") cause of action to the extent it is

15  based on alleged malicious prosecution – accrued on January 25, 2012, the date of the

16  incident.  Baddour has alleged no facts to show that any equitable tolling is warranted.

17  Thus, the second (false arrest), and fifth (Monell) causes of action, and the false arrest

18  and false imprisonment portions of the third ("stigma-plus") causes of action, must be

19  dismissed as untimely.

20    A claim for malicious prosecution under § 1983 incorporates the elements of the

21  state common law tort of malicious prosecution.  See Awabdy v. City of Adelanto, 368

22  F.3d 1062, 1066-68 (9th Cir. 2004); Usher v. City of Los Angeles, 828 F.2d 556, 562 (9th

23  Cir. 1987).  The elements of malicious prosecution under California law are that a prior

24  action was commenced by or at the direction of the defendant, was pursued to a legal

25  termination in the plaintiff's favor, was brought without probable cause, and was initiated

26  with malice.  See Daniels v. Robbins, 182 Cal. App. 4th 204, 216 (2010); Sagonowsky v.

27  More, 64 Cal. App. 4th 122, 128 (1998); see also Awabdy, 368 F.3d at 1066-68.

28    In federal court, a claim for malicious prosecution accrues only upon "favorable

1   termination" of the underlying criminal proceeding.  See Cabrera v. City of Huntington

2   Park, 159 F.3d 374, 382 (9th Cir. 1998); see also RK Ventures, Inc. v. City of Seattle, 307

3   F.3d 1045, 1060 n.11 (9th Cir. 2002).

4          Here, Baddour contends that the date the malicious prosecution claim accrued

5   was the date the criminal charges against her were dismissed – March 23, 2012.  While

6   the complaint was not filed until March 24, 2014, the prior day was a Sunday.  Thus, she

7   argues, the filing on March 24, 2014, was timely as to the first (malicious prosecution)

8   cause of action, and (presumably) as to the malicious prosecution portion of the third

9   ("stigma-plus") cause of action.

10          However, the dismissal of the charges against Baddour cannot be considered a

11  "favorable termination."  A "favorable termination" is one that "indicate[s] the innocence of

12  the accused."  Jaffe v. Stone, 18 Cal. 2d 146, 150 (1941).  That is, "the termination must

13  reflect the merits of the action and the plaintiff's innocence of the misconduct alleged in

14  the lawsuit."  Casa Herrera, Inc. v. Beydoun, 32 Cal. 4th 336, 342 (2004) (citation and

15  quotation omitted); see also Sycamore Ridge Apartments, LLC v. Naumann, 157 Cal.

16  App. 4th 1385, 1399 (2007).  If a dismissal is based "on technical grounds, for procedural

17  reasons, or for any other reason not inconsistent with his guilt, it does not constitute a

18  favorable termination."  Jaffe, 18 Cal.2d at 150; see also Gressett v. Contra Costa Cnty.,

19  2015 WL 1054975 at *6-7 (N.D. Cal. March 10, 2015).  Whether there was a favorable

20  termination is a legal issue for the court to decide.  See Sierra Club Found. v. Graham,

21  72 Cal. App. 4th 1135, 1149 (1999).

22          It is undisputed that the prosecutor dismissed the criminal charges against

23  Baddour after having viewed the film recorded in the interview room on the day of the

24  incident, which showed Salfiti looking at Officer Hart's notes.  However, there was no

25  finding by a court that Baddour was innocent of the charges, and there was no ruling on

26  the merits of the case.  Because the dismissal of the charges does not reflect on

27  plaintiff's innocence or guilt in connection with the underlying charges and cannot be

28  considered a favorable termination, the malicious prosecution claims never accrued.

United States District Court
Northern District of California

1  More importantly, however, because "favorable termination" is an essential element of a

2  claim of malicious prosecution, the malicious prosecution claims fail for lack of evidence.

3       The two remaining claims – the sixth (spousal abuse) and seventh (intentional

4  infliction of emotional distress) causes of action – are asserted against Salfiti only.  The

5  court accepts that plaintiff intended to assert a violation of Civil Code § 1708.6 rather than

6  a violation of § 1708.5 as alleged in the FAC.  A § 1708.6 domestic violence claim is

7  subject to a three-year statute of limitations.  Pugliese v. Sup. Ct., 146 Cal. App. 4th

8  1444, 1448-51 (2007).

9       The Pugliese court also acknowledged that the statute of limitation for the tort of

10  infliction of emotional distress (IIED) is two years (under Civil Code § 335.1) but

11  suggested that because infliction of emotional distress is part of the tort of domestic

12  violence, a claim of IIED in that context may also be subject to a three-year limitations

13  period.  Id. at 1450-51.  Here, the spousal abuse claim asserted in the complaint appears

14  to be based solely on the events of January 25, 2012.  Thus, because the complaint was

15  filed less than three years after the incident, the court finds that the spousal abuse and

16  IIED claims are not time-barred.

17            b.     Conspiracy claims

18       As a further basis for dismissing the first four causes of action, defendants argue

19  that Baddour has no evidence to support any of her conspiracy claims.  As set forth

20  above, each of the first four causes of action alleges a conspiracy to violate Baddour's

21  constitutional or civil rights.

22       In the first cause of action, Baddour alleges that Hart and Salfiti entered into a

23  conspiracy to prosecute her maliciously based on "trumped up felony charges of

24  domestic violence and child endangerment."  FAC ¶ 42.  In the second cause of action,

25  Baddour alleges that Hart, Salfiti and "Doe" 1 conspired to falsely arrest and falsely

26  imprison her.  FAC ¶ 50. In the third cause of action, Baddour alleges that Hart, Salfiti,

27  and "Doe" 1 "knew" that Baddour had not hit Salfiti, and conspired to "make a false

28  arrest, a false imprisonment, and to defame . . . and to initiate a malicious prosecution of

United States District Court
Northern District of California

Baddour."  FAC ¶ 57.  In the fourth cause of action, Baddour alleges that Hart, Salfiti, and "Doe" 1 "knew" that Baddour had not hit Salfiti on the head or caused trauma to him or endangered her children, and that they conspired "to make a false arrest, a false imprisonment, to commit defamation, and, in the case of Hart and Salfiti, a malicious prosecution of Baddour."  FAC ¶ 64.

Baddour's conspiracy theory appears to be based on her contention that Officer Hart left his notes behind in the interrogation room with the intention that Salfiti read them, with the result that Salfiti was able to tailor his statement to the police to wrongfully cause her false arrest and related harm.  See FAC ¶¶ 31-33.  She asserts that when Officer Hart returned to the interrogation room, Hart did not "make any acknowledgment" that he had left the notes behind, and that this was because he and Salfiti "had entered into a conspiracy to make a false arrest, a false imprisonment, and initiate a malicious prosecution of Baddour based on Officer Hart's interview of Salfiti."  FAC ¶ 32.  In her motion to strike, Baddour contends that Officer Hart and Salfiti conspired to violate Brady/Giglio (Brady v. Maryland, 373 U.S. 83 (1963); Giglio v. United States, 405 U.S. 150 (1972)) by suppressing the evidence that Salfiti had looked at Officer Hart's notes when Officer Hart left the room.

Conspiracy is "a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration."  Applied Eqiuip. Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 510-11 (1994) (reciting elements of action for civil conspiracy).  To demonstrate liability for a conspiracy under § 1983, a plaintiff must "demonstrate the existence of an agreement or meeting of the minds to violate constitutional rights."  Mendocino Envt'l Ctr. v. Mendocino Cnty., 192 F.3d 1283, 1301 (9th Cir. 1999).  Such an agreement "need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants."  Id.

The Daly City defendants contend that plaintiff has no evidence that Officer Hart – or anyone else affiliated with the City of Daly City – conspired with Salfiti to violate

United States District Court
Northern District of California

1   Baddour's civil rights, or that Officer Hart or anyone in the City had any prior relationship

2   with Salfiti.  They note that in her deposition, Baddour admitted she was not aware of any

3   relationship between Officer Hart and Salfiti prior to their meeting at the DCPD on

4   January 25, 2012, or indeed of any relationship between Salfiti and anyone from the City

5   of Daly City.  She also testified that she believed it was "possible" that there was a

6   conspiracy between the City, Officer Hart, and Salfiti to have her arrested, but conceded

7   that she was not certain and claimed that her belief was based solely on the fact that

8   when Officer Hart came to her residence (before he meet with Salfiti at the DCPD), he did

9   not immediately "help" or "protect" her.

10          Defendants contend that this testimony shows that Baddour's conspiracy theory is

11  based on speculative and illusory facts, with no connection with the events that led to her

12  arrest.  Moreover, Salfiti notes, both he and Officer Hart state in declarations that they

13  had never met each other before January 25, 2012, and both deny conspiring to violate

14  Baddour's civil rights, and Baddour has no evidence to counter that testimony.

15          In addition, Salfiti argues that his review of Hart's notebook in the interview room is

16  wholly insignificant and has no connection or relation to Baddour's legal and factual

17  conspiracy allegations.  He asserts that Baddour has no evidence that Officer Hart

18  deliberately left the notes in the interrogation room, that he deliberately left the notes

19  behind for Salfiti, that Salfiti's review of the notes infringed on her civil rights, that Salfiti's

20  review of the notes had any effect on his interview  with Hart or on Hart's investigation,

21  that it negated Salfiti's head injury, or that it had any effect on Hart's probable cause

22  determination, which was shared by his supervisor.

23          The court finds that Baddour has provided no evidence – even circumstantial

24  evidence – to support the existence of a conspiracy between Salfiti and Officer Hart.  It is

25  undisputed that the two men had no prior relationship and had never even met before the

26  day of the incident.  The fact that Officer Hart inadvertently left his notebook in the

27  interview room, and that Salfiti looked at the notes, is not in itself circumstantial evidence

28  of a conspiracy.  Nor is the fact that Officer Hart made a determination (after consulting

14

with his supervisor) that there was probable cause to arrest Baddour.

As for Baddour's arguments with regard to Brady/Giglio, the court notes that the rule articulated in those cases is applicable in criminal proceedings – specifically, in criminal trials where the defendant can show that the prosecutor has failed to disclose potentially exculpatory evidence.  Where the defendant is convicted following such a trial, a violation of Brady/Giglio results in a violation of due process which in turn requires a new trial.  See Giglio, 405 U.S. at 153-55; Brady, 373 U.S. at 87-88.  Here, however, the criminal charges against Baddour were dismissed after the District Attorney learned that Salfiti had looked at Officer Hart's notes in the interview room.  There was no criminal trial or conviction in which the Brady/Giglio rules would have any relevance.

c.       Probable cause to arrest

As yet another basis for dismissing the § 1983 malicious prosecution, false arrest, and "stigma-plus" claims, the Daly City defendants argue that Officer Hart had probable cause to arrest Baddour.  The absence of probable cause is a necessary element in a § 1983 malicious prosecution, false arrest, or "stigma-plus" claim.  Awabdy, 368 F.3d at 1066; Barry v. Fowler, 902 F.2d 770, 772-73 (9th Cir. 1990).  Thus, "a malicious prosecution suit may be defended by showing that the underlying action was brought with probable cause."  Amwest Mort. Corp. v. Grady, 925 F.2d 1162, 1164 (9th Cir. 1991).

The test for whether probable cause exists is whether "at the moment of arrest the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the petitioner had committed or was committing an offense."  United States v. Jensen, 425 F.3d 698, 704 (9th Cir. 2005) (citation and quotation omitted); see also Beier v. City of Lewiston, 354 F.3d 1058, 1065 (9th Cir.2004); Grant v. City of Long Beach, 315 F.3d 1081, 1085 (9th Cir.2002).   Because the probable cause standard is objective, probable cause supports an arrest so long as the arresting officer had probable cause to arrest the suspect for any criminal offense, regardless of the stated reason for the arrest.  Devenpeck v. Alford, 543 U.S. 146, 153-55 (2004) (arresting officer's state of

mind (except for the facts that he knows) is irrelevant to the existence of probable cause).

Here, the evidence shows that based on the facts and circumstances known to Officer Hart – as further supported by the video of the incident – there was probable cause for Baddour's arrest.  Both Baddour and Salfiti reported they got into a verbal confrontation in front of two of their children; both Baddour and Salfiti told Officer Hart that Baddour went up to Salfiti and tried to grab his cellphone out of his hand; Baddour denied hitting Salfiti, but admitting throwing his Rolex watch onto the front lawn.  In addition, prior to the interview with Salfiti, Officer Hart viewed the video of the incident Salfiti had taken with his cellphone, and he observed Baddour in an angry and emotional state, observed two children, with frightened looks on their faces, and observed Baddour charging towards Salfiti with her hands up.  He also noted that the video does not show Salfiti attempting to physically harm Baddour; and that Salfiti denied placing his hands on Baddour or harming her in any way.  In addition, while Baddour claimed that the cut on her thumb may have resulted from the scuffle over the cellphone, Salfiti reported a red area on his head which he claimed resulted from blows from Baddour.

Officer Hart states that he made the decision to arrest Baddour as the dominant aggressor based on all the facts known to him at the time, which included the facts listed above.  Thus, defendants argue, because Officer Hart had probable cause to arrest Baddour, the false arrest and malicious prosecution claims fail as a matter of law.

The court finds, given the totality of the circumstances – the statements made by both Baddour and Salfiti, the video evidence, the physical evidence – Officer Hart reasonably believed that Baddour had inflicted corporal injury on Salfiti, and that she had caused or permitted two of her children to suffer mental suffering.  Thus, defendants have established that Officer Hart had probable cause to arrest Baddour and charge her with domestic violence and child endangerment.  Baddour argues in the motion to strike that the video was tampered with, and thus that it cannot be considered as evidence, but for the reasons explained below with regard to the motion to strike, she has not met her burden of showing that the video evidence must be excluded.

1                      d.      Qualified immunity

2          The Daly City defendants argue that Officer Hart is entitled to qualified immunity

3 with regard to the constitutional claims.  Qualified immunity is "protects government

4 officials 'from liability for civil damages insofar as their conduct does not violate clearly

5 established statutory or constitutional rights of which a reasonable person would have

6 known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald,

7 457 U.S. 800, 818 (1982)).  It is "an entitlement not to stand trial or face the other

8 burdens of litigation."  Saucier v. Katz, 533 U.S. 194, 200 (2001) (quotation and citation

9 omitted).  An officer with qualified immunity is not liable even when his or her conduct

10 resulted from "a mistake of law, a mistake of fact, or a mistake based on mixed questions

11 of law and fact."  Pearson, 555 U.S. at 231 (internal quotation marks omitted).

12          In the qualified immunity analysis, the court considers (1) whether the officer's

13 conduct, viewed in the light most favorable to the party asserting injury, violated a

14 constitutional right; and (2) whether the right "was clearly established" such that a

15 reasonable officer would have known his conduct violated the right.  Saucier, 533 U.S. at

16 201.  It is within the court's discretion to decide which prong to address first in light of the

17 circumstances of the case and considerations of judicial economy.  Pearson, 555 U.S. at

18 236.

19          Here, the court need consider only the first of these two prongs.  Baddour has

20 provided no evidence of any constitutional violation.  Accordingly, Officer Hart is entitled

21 to qualified immunity.

22                      e.      Monell claim

23          As a further basis for dismissing the fifth (municipal liability) cause of action,

24 defendants argue that Baddour has no evidence to support such a claim.  In the

25 complaint, Baddour alleges that the City of Daly City violated § 1983 by "maintaining a

26 practice, custom, and habit whereby police personnel are improperly trained with respect

27 to domestic violence victims seeking EPO's and fail repeatedly to provide all the rights

28 domestic violence victims are entitled to based on the victim's female gender."  FAC ¶ 73.

United States District Court
Northern District of California

1    Section 1983 allows for a civil action against any person who, under color of law,

2    causes the "deprivation of any rights, privileges, or immunities secured by the

3    Constitution and laws." 42 U.S.C. § 1983. Municipalities may be held directly liable for

4    constitutional violations under § 1983, but the "cannot be held liable . . . on a respondeat

5    superior theory." Monell v. Dep't of Social Servs., 436 U.S. 658, 691 (1978). A local

6    government may be sued under § 1983 "when execution of a government's policy or

7    custom, whether made by its lawmakers or by those whose edicts or acts may fairly be

8    said to represent official policy, inflicts the injury." Id. at 694. However, where there is no

9    underlying constitutional violation, there can be no Monell liability. See Villegas v. Gilroy

10   Garlic Festival Ass'n, 541 F.3d 950, 957 (9th Cir. 2008); Scott v. Henrich, 39 F.3d 912,

11   916 (9th Cir. 1994); City of L.A. v. Heller, 475 U.S. 796, 799 (1986).

12   Defendants argue that Baddour cannot identify a practice, custom, or other pattern

13   that would support liability under Monell, and moreover, that no such practice, custom, or

14   pattern exists. Moreover, they contend, since Officer Hart's conduct was constitutional,

15   there can be no Monell liability. They assert that Baddour's "innuendo" is simply not

16   enough to carry her burden of persuasion or her burden of proof on this claim.

17   The court finds that Baddour has no evidence to support a Monell violation – that

18   is, no evidence sufficient to meet her burden of showing that a specific City policy

19   resulted in constitutional violations, nor any specific incidents of supervisors' failure to

20   discipline for or deliberate indifference to constitutional violations, nor any evidence of a

21   policy or practice of failure to train. Monell is clear that the constitutional tort must follow

22   from "official municipal policy." See Crowe v. Cnty. of San Diego, 608 F.3d 406, 445-46

23   (9th Cir. 2010). More importantly, because Baddour has no viable constitutional claim,

24   she cannot assert a claim of municipal liability under Monell.

25        f.    State tort claims

26   The two remaining state tort claims are the spousal abuse claim and the IIED

27   claim – both asserted only against Salfiti. Salfiti argues that summary judgment should

28   be granted as to these claims or that the court should decline to exercise supplemental

United States District Court
Northern District of California

1   jurisdiction over the state law claims.

2       A federal court may exercise supplemental jurisdiction over state law claims "that

3   are so related to claims in the action within [the court's] original jurisdiction that they form

4   part of the same case or controversy under Article III of the United States Constitution."

5   28 U.S.C. § 1367(a).  A court may decline to exercise supplemental jurisdiction, however,

6   where it "has dismissed all claims over which it has original jurisdiction."  See 28 U.S.C.

7   § 1367(c)(3).

8       In considering whether to retain supplemental jurisdiction, a court should consider

9   factors such as "economy, convenience, fairness, and comity."  Acri v. Varian Assocs.,

10  Inc., 114 F.3d 999, 1001 (9th Cir. 1997) (en banc) (quotations omitted).  However, "[i]n

11  the usual case in which all federal-law claims are eliminated before trial, the balance of

12  factors . . . will point toward declining to exercise jurisdiction over the remaining state law

13  claims."  Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 364 n.7 (1988).

14      As discussed above, plaintiff has not provided evidence sufficient to prevail on any

15  federal cause of action, or even to create a triable issue.  And the factors that guide this

16  court's decision whether to retain jurisdiction over plaintiff's remaining state law causes of

17  action for spousal abuse and infliction of emotional distress – economy, convenience,

18  fairness, and comity – favor dismissal.

19      Most notably, the remaining state law claims are closely related to the dispute

20  between Baddour and Salfiti that has been pending for more than four years in the Family

21  Law Division of the San Mateo County Superior Court.  This court has an interest in

22  avoiding needless adjudication of state-law claims, and as the spousal abuse and related

23  IIED claims plainly do not belong in federal court, the court declines to continue to

24  exercise jurisdiction over them.  The dismissal is without prejudice to refiling these two

25  claims in state court.

26      2.      Plaintiff's motion

27      Baddour argues that the City's copy of the cellphone video that Officer Hart

28  watched and listened to on January 25, 2012, was lost or destroyed, and that the video

1    now referred to as the "Salfiti video" (which was separately produced by Salfiti) was

2    altered and is therefore fraudulent and inadmissible.

3    As explained in more detail above, a DCPD Crime Analyst downloaded the video

4    from Salfiti's cellphone on January 25, 2012.  Baddour's claim that the Salfiti video is

5    fraudulent is based primarily on the fact that Officer Hart states in his police report that

6    when he watched the video in the interview room, he could hear Salfiti say that he was

7    recording, and could also hear Baddour say something to the effect that she was glad he

8    was recording, and that Salfiti also stated several times during the interview (videotaped)

9    at the police station that he told Baddour he was recording her, whereas the Salfiti video

10   does not include any discussion about the fact that Salfiti was recording.

11   Baddour's claim is also based on the fact that on March 18, 2015, the City

12   produced what it claimed was a copy of the 11 videos its Crime Analyst had downloaded

13   on January 25, 2015, but that the video of what purported to be the Salfiti video of the

14   incident was in fact only a "remnant of a frame of the video," which lasts only a second or

15   two, and that the City subsequently admitted during Baddour's October 9, 2015

16   deposition that it could not locate its copy of the video.

17   Based on this, Baddour argues that Officer Hart's statement that the Salfiti video

18   appeared to be the same video he had watched on January 25, 2012 was a false

19   statement.  She claims that  because the Salfiti video does not contain the statements

20   about Salfiti recording Baddour, Officer Hart "knew" that it was not the same video he had

21   viewed on January 25, 2012, and that he "falsely vouched for the authenticity" of video.

22   She speculated in her deposition that Salfiti "could have altered" the video by deleting

23   some frames (although she conceded that the video depicted the events as they

24   happened, and stated that she could not point to any part of the video that appeared to

25   have been tampered with).

26   Baddour asserts further that Officer Hart committed a <u>Brady</u>/<u>Giglio</u> violation by

27   leaving his Baddour interview notes alone in the room with Salfiti for 15 minutes; and that

28   he committed a <u>Trombetta</u> violation (<u>California v. Trombetta</u>, 467 U.S. 479 (1984)) by

United States District Court
Northern District of California

destroying the Baddour interview notes when he knew that Salfiti had looked at them and thus knew the notes could easily become an issue in the criminal trial and in a civil rights trial.

Baddour argues that the Salfiti video is fraudulent and should be stricken.  Here, she first asserts that the Hart and Salfiti declarations "attempting to authenticate" the Salfiti video are false, and that the video is not properly authenticated as required in United States v. McMillan, 508 F.2d 101, 104 (8th Cir. 1975) because it is not "authentic or correct" and because changes or deletions have been made to the recording.  She also points to United States of America v. Faurote, 749 F.2d 40, 43-44 (7th Cir. 1984), where the court held that in a criminal proceeding, a party attempting to admit an audio tape recording must prove by clear and convincing evidence that the tape is a true and authentic recording of a conversation, at a given time, between the parties.  Finally, she notes that in Siegal v. Am. Honda Motor Co., 921 F.2d 15, 16-17 (1st Cir. 1990), a wrongful death action alleging defective assembly of a motorcycle handlebar, the court excluded evidence of the motorcycle because the handlebar assembly was loose, corroded, gouged with tool marks, and appeared to have been altered.

The Daly City defendants argue that the motion to strike the video should be denied.  They contend that defendants and their counsel have not altered or destroyed any evidence, and that Baddour lacks any proof that they have done so.  They assert that they did not identify (in initial disclosures or otherwise) the video that was placed into evidence (the video downloaded by the City on January 25, 2012), since that particular videotape has been lost.  Rather, they contend, they have produced the Salfiti video, which was provided to them by Salfiti.  They assert that the Salfiti video was disclosed to Baddour more than 15 months ago, and its authenticity has been established by Salfiti.

Salfiti states in his declaration that he recorded the January 25, 2012 incident on his former cell phone; that he gave the phone to Officer Hart prior to his interview with Hart on January 25, 2012; that he made a copy of the video recording onto a disc in February 2012; that sometime in late 2012 or early 2013, he recycled his former phone

United States District Court
Northern District of California

United States District Court
Northern District of California

1   for a new one in the normal course of upgrading his phone; that when Baddour filed this

2   action, he gave the disc to his attorney, who then produced it with the August 21, 2014

3   initial disclosures; and that the video on the disc produced in August 2014 has never

4   been altered in any way.

5       Salfiti argues that all the elements required by the Federal Rules of Evidence

6   regarding use of a copy in lieu of the original are clearly established – he presented the

7   video to Hart; he made a copy of what he presented to Hart; a disc containing that copy

8   was produced as part of initial disclosures; he recycled the old phone that was used to

9   take the video more than two years before Baddour filed this action, and the recycling of

10  the old phone was done in the routine course of upgrading to a new phone.

11      The court finds that Baddour has not met her burden of showing that the Salfiti

12  video is inadmissible.  Rather than explaining why particular rules of evidence require

13  exclusion of the Salfiti video, plaintiff has focused on two relatively insignificant facts –

14  that Officer Hart stated that the video he watched on the day of the incident included a

15  statement by Salfiti that he was recording Baddour, but the Salfiti video does not include

16  this statement; and that the City admitted it lost or inadvertently destroyed the copy the

17  Crime Analyst made on January 25, 2012 (the copy Officer Hart watched on that date).

18  However, Baddour cites no rule that would preclude the use of the video under the

19  circumstances presented here.

20      The court interprets Baddour's argument as an assertion that without the video

21  (which she argues should not be allowed as evidence), defendants cannot show that

22  Officer Hart had probable cause to arrest her on January 25, 2012.  However, when

23  Officer Hart reported that he determined he had probable cause to arrest Baddour after

24  viewing the video, that was not the only evidence he considered.  His testimony makes

25  clear that he considered the totality of the evidence, including the video, when he made

26  that determination.  Further, lack of probable cause is relevant only to the false arrest and

27  malicious prosecution claims.  The court has already found that the false arrest claims

28  are time-barred, and that the malicious prosecution claims fail because plaintiff has no

1    evidence of a "favorable termination."

2         In addition, Baddour has provided no evidence to support her argument that the

3    video was altered or is fraudulent.  The fact that the version Hart originally viewed on the

4    date of the incident includes a statement by Salfiti that he was recording Baddour, and

5    that the copy produced by Salfiti does not, is not an indication that the substantive portion

6    of the video was "altered."  At most, it shows that a brief portion of the video was cut off

7    at the beginning.  However, that does not change the fact that the video (which Baddour

8    conceded at her deposition was an accurate depiction of the events) clearly shows

9    Baddour coming after Salfiti, and clearly shows two of the children present and

10   witnessing the events.  It is true that the video does not show Baddour actually striking

11   Salfiti, but there are sounds of impact, and Salfiti later had a red mark on his head.

12        The court finds further that the video is adequately authenticated.  Federal Rule of

13   Evidence 901 provides that "the proponent must produce evidence sufficient to support a

14   finding that the item is what the proponent claims it is" and that the evidence can be in

15   the form of testimony of a witness with knowledge that the "item is what it is claimed to

16   be."  Fed. R. Evid. 901(a), (b)(1).

17        The copy of the video that was originally in the possession of the City of Daly City

18   was a copy made from Salfiti's cellphone.  As Salfiti explains in his declaration in support

19   of his opposition to the motion to strike, within a month of the incident, he also copied the

20   original video from his cellphone to a disc.  Following this, in late 2012 or early 2013, he

21   "recycled" his old cellphone – the "smart" phone which he had used to record the video of

22   the incident – at which time he "upgraded" to a newer "smart" phone and discarded the

23   old "smart" phone.  This occurred more than a year prior to the date Baddour filed the

24   present lawsuit, and Salfiti had no reason to believe that he had any obligation to keep

25   possession of the phone he had used to record the incident.

26        The City lost the copy of the video that the Crime Analyst made on the day of the

27   incident, and thus, defendants later obtained the copy that had been maintained by

28   Salfiti.  It appears that the City's original copy included the "I am recording you"

United States District Court
Northern District of California

1   statement, while the copy provided by Salfiti does not.  Nevertheless, Officer Hart states

2   in his declaration that the Salfiti video comports with what he recalls seeing in the

3   interview room on the date of the incident, and both Salfiti and Baddour have testified that

4   the Salfiti video appears to accurately reflect what occurred on January 25, 2012.  Salfiti,

5   Officer Hart, and Baddour have all confirmed that the video shows the altercation

6   between Salfiti and Baddour in the garage of the residence on January 25, 2012.  The

7   court finds that defendants have sufficiently authenticated the video for purposes of

8   supporting their motion for summary judgment and opposing Baddour's motion to strike.

### CONCLUSION

10         In accordance with the foregoing, defendants' motion for summary judgment is

11   GRANTED as to the first through fifth causes of action; the sixth and seventh causes of

12   action are DISMISSED without prejudice to refiling in state court; and plaintiff's motion to

13   strike and for sanctions is DENIED.

**IT IS SO ORDERED.**

Dated:  January 28, 2016

_____
PHYLLIS J. HAMILTON
United States District Judge

24